UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JON ZAMELIS, an individual,

        Plaintiff,

   v.

WINGFOOT COMMERCIAL TIRE SYSTEMS, LLC, a Washington Limited Liability Company,

        Defendant.

CASE NO. C08-1588 RSM

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, GRANTING PLAINTIFF'S MOTION TO STRIKE, AND ORDERING DEFENDANT TO SHOW CAUSE WHY SANCTIONS SHOULD NOT BE IMPOSED

## **I. INTRODUCTION**

This matter comes before the Court on Defendant's Motion for Summary Judgment (Dkt. #17). This dispute arises from a series of compensation agreements, including an oral agreement, between Plaintiff Jon Zamelis ("Zamelis") and Defendant Wingfoot Commercial Tire Systems, LLC ("Wingfoot"). Zamelis alleges in his complaint that he is entitled to damages for breach of contract as well as willful withholding of commissions in violation of Washington's Wage Statutes. Wingfoot contends that it did not breach any written contract and there is no admissible evidence of an enforceable oral agreement. For the reasons set forth below, the Court GRANTS IN PART AND DENIES IN PART Wingfoot's motion.

## II. DISCUSSION

**A. Background**

Wingfoot, a subsidiary of Goodyear Tire Company, sells tires for commercial vehicles, off-the-road tires for heavy equipment, farm tires, and RV tires. Zamelis worked for Wingfoot as a tire salesman when Wingfoot first spun off from Goodyear in 2001 until he was terminated in February 2009. At all times he was employed at will. He was very successful as a salesman and was admitted to Wingfoot's "Ring of Honor," an elite group of top salespersons. Salespersons at Wingfoot are paid the greater of a base salary or commissions on sales according to Wingfoot's Sales Commission Plan ("Commission Plan") which outlines the commissions to be paid on various transactions. Although the wording of the Commission Plan changed slightly every year, in most years relevant to this lawsuit, the plan stated that commissions on tires would be earned at 20% of "gross profit."

Wingfoot had two measures of gross profit, "inventory gross profit" and "commission gross profit." Inventory gross profit is the difference between the sale price of a tire and the actual cost of the tire. Commission gross profit is calculated as the difference between the sale price and "commission cost" which is the actual cost of the tire plus an additional factor set by Wingfoot. Thus, inventory gross profit is always higher than commission gross profit. While the Commission Plan for most years stated that salespersons were paid 20% of "gross profit" on tire sales, in practice, salespersons were paid 20% of commission gross profit.[1]

In 2004, Zamelis became frustrated with inconsistencies and uncertainties in Wingfoot's commission system. He was concerned that although the Commission Plan stated he was entitled to a percentage of gross profit, he was being paid a percentage of commission gross profit, a variable that he did not understand. Additionally, even though Zamelis was one of the top salespersons for Wingfoot and a member of the Ring of Honor, Zamelis's base salary was only $1,600 per month, significantly less than other Wingfoot salespersons who were considerably less qualified than Zamelis and had fewer sales.

---

[1] The Commission Plan for 2007 stated that salespersons would be paid 20% of "commission gross profit." In 2008, however, the Commission Plan reverted back to the ambiguous "gross profit" terminology.

ORDER
PAGE - 2

Zamelis discussed his concerns with his supervisor, Lee Finch, who passed them along to his supervisor, Walt Richards, the Regional Director. Richards came to the outlet where Zamelis worked to meet with Zamelis in person. During that meeting, Zamelis requested an increase in his base salary to $3,000. Richards explained that Zamelis would be better off accepting a special commission arrangement. According to Zamelis, Richards agreed to pay him 20% of inventory gross profit. To implement this, rather than alter Zamelis's written contract or change matters with payroll, Zamelis and Richards implemented a procedure whereby Zamelis would fill out an Incentive Adjustment Request for the difference between the commission Zamelis ordinarily received on commission gross profits and the commission on the entire gross profit. He would submit the Incentive Adjustment Requests to Finch who would pass them up the chain to Richards, who would approve them.

Richards characterized the special arrangement with Zamelis a little differently in his deposition testimony. According to him, the agreement was that Wingfoot would pay Zamelis 20% of inventory gross profit on certain transactions, those involving off-the-road tires, and this would be done through Zamelis's submission of Incentive Adjustment Requests that had to be approved by Richards and Finch. Richards's deposition testimony is vague on whether Richards would exercise discretion in approving the Requests or whether he agreed to approve them so long as the Requests involved off-the-road tire sales and were calculated correctly.

Zamelis submitted Incentive Adjustment Requests in accordance with the agreement. However, because it was difficult to determine the inventory gross profit for items sold based on the data available to Zamelis and his limited computer skills, it was tedious to submit Requests. He therefore only submitted Requests for higher profit items such as large off-the-road tires. However, according to him, he submitted Requests for adjustment on commercial truck tires on six occasions. From 2005 when the special arrangement started until summer 2008, all of Zamelis's Incentive Adjustment Requests were approved.

In January 2008, Rick Wheeler replaced Walt Richards as the Regional Director. Initially, Wheeler approved all of Zamelis's Incentive Adjustment Requests. However, in July or August 2008, motivated by a need to cut costs, Wheeler decided to discontinue the special

ORDER
PAGE - 3

arrangement. This was communicated to Zamelis on or about September 7, 2008, when Finch showed him an e-mail from Wheeler explaining that the deal was canceled. Wheeler did not approve Incentive Adjustment Requests for Zamelis's sales in July and August and consequently Zamelis was never paid according to the special arrangement for those months. Zamelis continued to work at Wingfoot until February 2009 when he was terminated.

Zamelis brings this suit seeking commissions according to the special arrangement for all sales between October 2005 and December 2008 for which he has not been paid. This includes sales for which Zamelis never submitted an Incentive Adjustment Request. Zamelis also alleges that the withholding of his commissions is willful and in violation of RCW 49.48.10 and 49.52.050, which if proved, would entitle him to double damages and attorney's fees.[2]

**B. Standard of Review**

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FRCP 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The Court must draw all reasonable inferences in favor of the non-moving party. *See F.D.I.C. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992), *rev'd on other grounds*, 512 U.S. 79 (1994). The moving party has the burden of demonstrating the absence of a genuine issue of material fact for trial. *See Anderson*, 477 U.S. at 257. Mere disagreement, or the bald assertion that a genuine issue of material fact exists, does not preclude the use of summary judgment. *See Coverdell v. Dept. of Social and Health Servs.*, 834 F.2d 758, 769 (9th Cir. 1987).

Genuine factual issues are those for which the evidence is such that "a reasonable jury could return a verdict for the non-moving party." *Anderson, 477 U.S. at 248*. Material facts are those which might affect the outcome of the suit under governing law. *Id.* In ruling on summary judgment, a court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d

---

[2] Wingfoot also brings counterclaims against Zamelis for misappropriation of funds, wrongful conversion, fraud, and breach of duty of loyalty, but these claims are not relevant to the present motion.

ORDER
PAGE - 4

547, 549 (9th Cir. 1994) (*citing O'Melveny & Meyers*, 969 F.2d at 747). Conclusory or speculative testimony is insufficient to raise a genuine issue of fact. *Anheuser-Busch, Inc. v. Natural Beverage Distributors*, 60 F. 3d 337, 345 (9th Cir. 1995).

**C. Liability Based on Written Commission Plan**

Zamelis argues that regardless of the special arrangement he reached with Richards, he is entitled to 20% of inventory gross profit on tire sales pursuant to the written Commission Plan. Contract interpretation is a matter of law properly decided on summary judgment. *See U.S. v. King Features Entm't, Inc.*, 843 F.2d 394, 398 (9th Cir. 1988).

While the Commission Plan changed from year to year, in most relevant years it stated that salespersons were entitled to 20% of "gross profit" for tire sales. Zamelis argues first that the plain meaning of "gross profit" supports his position. Second, he argues that the Commission Plan used the term "commission gross profit" elsewhere in the plan, and thus, under the construction rule that different terms must have different meanings, "gross profit" cannot mean the same thing as "commission gross profit" and must therefore mean "inventory gross profit."

These arguments, though appealing at first, do not resolve the ambiguity. First, it is noteworthy that the 2008 version of the Commission Plan states that salespersons are entitled to 20% of "gross profit" and then uses the term "inventory gross profit" elsewhere in the same plan, but does not use the term "commission gross profit." By Plaintiff's very same logic then, "gross profit" must mean something different than "inventory gross profit." And it would be nonsensical to conclude that the term "gross profit" means vastly different things in different years with no explanation by Wingfoot. Furthermore, the plain meaning of "gross profit" is sales price minus cost, and both inventory gross profit and commission gross profit fall under this meaning. The difference between the terms lies in which measure of cost is used, the cost of the tire only (inventory gross profit) or the cost of the tire plus an estimate of the cost Wingfoot will pay to its employee as a commission (commission gross profit). Thus one cannot decipher the meaning of "gross profit" looking solely to the contract itself.

However, the course of conduct between the parties and Wingfoot's course of conduct with its sales force makes it clear that commissions were to be paid based on commission gross profit. *See Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wash. 2d 493, 503 (2005) (extrinsic evidence may be used to determine the meaning of specific terms but not to contradict the written contract). It is undisputed that from 2001 until the time Zamelis negotiated his special arrangement with Richards, Zamelis was paid commissions on commission gross profit, not inventory gross profit. It is also undisputed that every other Wingfoot tire salesman, since the time of Wingfoot's formation, working pursuant to this same Commission Plan, was paid commissions on commission gross profit, not inventory gross profit. In the face of these undisputed facts, the term "gross profit" in the Commission Plan means "commission gross profit" as a matter of law. Therefore, the Commission Plan cannot be a basis for Wingfoot's liability in this case.

**D. Enforceability of Oral Modification**

If Wingfoot owes Zamelis commissions then, it will be pursuant to the oral agreement, or special arrangement, Zamelis made with Richards. Wingfoot argues that such an agreement, if made, is an unenforceable illusory promise because Richards's approval of Zamelis's Incentive Adjustment Requests was entirely discretionary. *See Goodpaster v. Pfizer, Inc.*, 35 Wash. App. 199, 203 (1983) ("A supposed promise may be illusory because it is so indefinite that it cannot be enforced, or by reason of provision contained in the promise which make its performance optional or entirely discretionary by the promisor."). Wingfoot points to the fact that the very name "Incentive Adjustment *Request*" indicates that it is a request to be approved at the employer's discretion, not an entitlement. However, this fact is not dispositive. Zamelis testified that Richards agreed to pay commissions on inventory gross profit and simply used the Incentive Adjustment Request as a means to carry out this agreement without writing a new Commission Plan customized to Zamelis. Neither Finch's testimony nor Richards's testimony is inconsistent with this account. Moreover, Richards never rejected any of Zamelis's Incentive Adjustment Requests subsequent to the agreement. Finally, the handwritten Incentive Adjustment Requests that Zamelis submitted to Richards

through Finch say "Agreed Compensation" in the description section of the form, indicating that there was an agreement to approve the "request." Based on these facts, reasonable minds could differ as to whether approval of these requests was discretionary under the oral agreement. Summary judgment is inappropriate.

Wingfoot initially argued that the oral agreement between Zamelis and Richards violates the statute of frauds but has correctly abandoned this argument in its reply brief. The statute of frauds only applies to agreements that are not capable of being performed within one year. Since Zamelis was employed at will, he could be terminated at any time and thus the agreement to pay increased commissions while Zamelis was employed could be performed in less than one year. Consequently, the statute of frauds does not apply. *See Duncan*, 148 Wash. App. 52, 73 (2008) (holding that a terminable at will contract is outside the statute of frauds).

In sum, this Court cannot say that the oral modification of the Commission Plan is unenforceable as a matter of law. The oral agreement raises various issues of fact that must be resolved by a jury. A jury must decide whether there was an agreement, what the terms of that agreement were including whether it applied to all tires or a subset, whether filing Incentive Adjustment Requests was a condition of the agreement, and whether Richards agreed to approve the Incentive Adjustment Requests.

**E. Termination of Richards's Oral Modification**

The parties disagree as to whether Wingfoot could unilaterally reduce Zamelis's commissions by refusing to continue the special arrangement. Washington law holds that an at-will contract may be unilaterally modified by either side. *Mall Tool Co. v. Far West Equipment Co.*, 45 Wash. 2d 158, 162 (1954); *Duncan*, 148 Wash App. at 73; *Cascade Auto Glass, Inc. v. Progressive Casualty Ins. Co.*, 135 Wash. App. 760, 768 (2006). However, Zamelis argues this rule should not apply in this case because he withdrew his request for an increase in base salary in consideration for the special commission arrangement. Indeed, under Washington law, an at-will contract may be transformed into a for-cause contract if "the employee gives consideration in addition to the contemplated service." *Thompson v. St.*

*Regis Paper Co.*, 102 Wash. 2d 219, 223 (1984). This can cause the contract not to be unilaterally modifiable by the employer. *See Duncan*, 148 Wash. App. at 74. In this case, however, Zamelis's withdrawal of a request for an increase in base salary does not constitute additional consideration that would modify his at-will status. Zamelis merely withdrew a proposal for one contract modification in favor of accepting a different contract modification. When a promisee requests X, something to which he is not legally entitled, at the beginning of negotiations and receives Y at the end of negotiations, it cannot be said that the promisee's withdrawal of a request for X is consideration for receiving Y. Accordingly, Wingfoot was free to modify Zamelis's compensation by terminating the special arrangement. Zamelis accepted this modification by continuing to work for Wingfoot.

Of course, Zamelis is entitled to special arrangement commissions for sales made prior to Wingfoot's termination of that arrangement. An at-will agreement is terminated when one party gives the other party notice of termination. Thus, the special commission arrangement was not legally modified until Zamelis received notice of Wheeler's decision to modify it. This date is disputed and must be proved at trial. As a matter of law, however, Zamelis is not entitled to damages for sales made after receiving notice of Wheeler's modification.

### F. Willful Withholding of Commissions

Under Washington law, an employer who "[w]illfully and with intent to deprive the employee of any part of his wages," withholds wages "shall be guilty of a misdemeanor." RCW 49.52.050(2). The employer who violates this statute "shall be liable in a civil action by the aggrieved employee" for twice the amount of the wages withheld in addition to attorney's fees and costs. RCW 49.52.070. The "critical determination" in a case alleging willful withholding of wages is whether the employer's failure to pay wages was willful. *Duncan*, 148 Wash. App. at 78-79. "The nonpayment of wages is willful when it is the result of a knowing and intentional action and not the result of a bona fide dispute." *Lillig v. Becton-Dickinson*, 105 Wash. 2d 653, 659 (1986). "A bona fide dispute is one that is 'fairly debatable.'" *Duncan*, 148 Wash. App. at 79 (quoting *Schilling v. Raido Holdings, Inc.*, 136 Wash. 2d 152, 161 (1998). "An employer's genuine belief that he is not obligated to pay

certain wages precludes the withholding of wages from falling within the operation of RCW 49.52.050(2) and 49.52.070." *Ebling v. Gove's Cove, Inc.*, 34 Wash. App. 495, 500 (1983). The question of willfulness is a question of fact. *Schilling*, 136 Wash. 2d at 160.

Here, Wingfoot argues that it had a bona fide dispute with Zamelis when Wheeler ceased paying commissions after notifying Zamelis he would terminate the special commission arrangement. As explained above, as a matter of law, Zamelis is not entitled to any damages for failure to pay special arrangement commissions *after* receiving notice of Wheeler's decision to terminate the arrangement. However, there are genuine issues of material fact regarding whether Wingfoot failed to pay Zamelis commissions earned *before* he received notice that the agreement would be terminated and whether this failure to pay was willful. Therefore, the Court will not grant summary judgment on this issue.

**G. Motion to Strike**

In its reply brief, Wingfoot specifically included a footnote summarizing Zamelis's criminal history to aid the Court "in judging credibility." (Dkt. #28 at n.1). Zamelis moves to strike that reference and strike the excerpts of his deposition testimony concerning his criminal history that were submitted to the Court as part of the Second Declaration of Leigh Ann Collings Tift on behalf of Wingfoot (Dkt. #29 at 6-10) as irrelevant and prejudicial. Zamelis argues the information was submitted in bad faith to induce a decision on an improper basis and requests sanctions including reasonable attorney's fees incurred in filing its Motion to Strike.

It is a fundamental principle of summary judgment that the Court does not weigh evidence or consider credibility. In fact, this principle is so fundamental that Wingfoot's counsel is undoubtedly aware of it. Since "judging credibility" is clearly an irrelevant purpose for submitting such evidence at the summary judgment stage, the Court is inclined to infer that such evidence was submitted in bad faith to prejudice the Court.[3] Therefore,

---

[3] Zamelis also argues that submission of such evidence violates Federal Rule of Evidence 609(b)which states that "evidence of a conviction more than 10 years old as calculated herein, is not admissible unless the proponent gives to the adverse party sufficient advance notice of the intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence." Zamelis's most recent conviction is approximately 15

ORDER
PAGE - 9

Wingfoot is ORDERED to show cause within seven (7) days of the issuance of this Order why it should not be sanctioned.

Zamelis need not worry that he has been prejudiced by the improper submission of this evidence. Although Zamelis's point that it can be difficult to "unring the bell" is well taken, the Court has properly refrained from making credibility determinations at the summary judgment stage.

### III. CONCLUSION

Having reviewed the relevant pleadings, the declarations and exhibits attached thereto, and the remainder of the record, the Court hereby finds and ORDERS:

(1) Defendant's Motion for Summary Judgment (Dkt. #17) is GRANTED IN PART and DENIED IN PART as explained above.

(2) Plaintiff's Motion to Strike (Dkt. #33) is GRANTED. Footnote 1 of docket number 28 is stricken. Pages 6-10 of docket number 29 are stricken.

(3) Defendant is ORDERED to show cause within (7) days of the issuance of this Order why sanctions should not be imposed.

(4) The Clerk is directed to forward a copy of this Order to all counsel of record.

DATED this __26__ day October, 2009.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

---

to 17 years old although it is unclear when he was released from confinement if any confinement was imposed. *See* Fed. R. Evid. 609(b) (time runs from date of conviction or release from confinement, whichever is later).

ORDER
PAGE - 10